UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**Not for Publication**

NATIONAL MANUFACTURING CO., INC.,

*Plaintiff*,

v.

CITIZENS INSURANCE COMPANY OF
AMERICA and THE HANOVER INSURANCE
GROUP, INC.,

*Defendant*s,

v.

JANED ENTERPRISES, INC.,

*Third-Party Defendant.*

Civil Action No. 13-314

**OPINION**

**John Michael Vazquez, U.S.D.J.**

 This case involves an insurance coverage dispute.  Presently, four motions are pending
before the Court: (1) Plaintiff National Manufacturing Co., Inc.'s ("National" or "Plaintiff")
*Daubert* motion to exclude or in the alternative to limit expert testimony (D.E. 93); (2)  National's
motion for partial summary judgment related to subrogation (D.E. 94); (3) National's motion for
partial summary judgment (D.E. 96); and (4) Defendant Citizens Insurance Company of America's
("Citizens" or "Defendant") motion for summary judgment (D.E. 98).[1]  Third-Party Defendant

---

[1] Plaintiff's Brief in support of its Subrogation Motion will be referred to hereinafter as "Pl.
Subrogation Br." (D.E. 94), Defendant's Opposition to Plaintiff's Subrogation brief will be
referred to hereinafter as "Def. Subrogation Opp'n" (D.E. 113), and Plaintiff's Reply Brief in

Janed Enterprises, Inc. ("Janed"), joined National's motion regarding subrogation.  All motions are opposed.

The Court held oral argument on these motions on November 18, 2016.  D.E. 150.  The Court has considered all submissions as well as the parties' oral arguments.  This opinion will first discuss the motions for summary judgment followed by a discussion on subrogation.  In light of the Court's ruling on the summary judgment motions, it is not necessary to review the *Daubert* motion.  For the reasons stated below, the Court grants in part and denies in part Defendant's Motion for Summary Judgment, and grants in part and denies in part Plaintiff's Motion for Partial Summary Judgement.  Specifically, Defendant's motion is denied as it relates to coverage.  Defendant's motion is granted as to the issue of bad faith.  Plaintiff's Motion for Summary Judgment is granted on the issues of coverage and cooperation.  Plaintiff's motion is denied on the issue of subrogation.

---

support of its Subrogation Motion will be referred to hereinafter as "Pl. Subrogation R.Br." (D.E. 127).

Plaintiff's Brief in support of its Motion for Partial Summary Judgment will be referred to hereinafter as "Pl. Br." (D.E. 96), Defendant's Opposition to Plaintiff's Brief will be referred to hereinafter as "Def. Opp'n" (D.E. 118), and Plaintiff's Reply Brief in support of its Motion will be referred to hereinafter as "Pl. R.Br." (D.E. 124).

Defendant's Brief in support of its Motion for Summary Judgment will be referred to hereinafter as "Def. Br." (D.E. 98), Plaintiff's Opposition to Defendant's Brief will be referred to hereinafter as "Pl. Opp'n" (D.E. 112), and Defendant's Reply Brief in support of its Motion will be referred to hereinafter as "Def. R.Br." (D.E. 129).

## I.  BACKGROUND[2]

This action is a dispute over insurance coverage.  Plaintiff is a company engaged in the business of producing "precision deep drawn and shallow drawn metal components," including stainless steel battery casings used in pacemakers in the medical field.  Compl. ¶¶ 10, 14; *see also* Staudinger Aff. ¶¶ 1, 3.  The current suit stems from pitting to the metal casings.  The manufacturing process to make the metal parts varies slightly depending on the type of part, but generally includes the following steps.  First, National receives stainless steel coils that, after inspection, are fed into stamping machines, which results in a "final three-dimensional product." D.E. 99, Def. Statement of Facts ¶ 3.  The parts are then lubricated with oil prior to being shaped to reduce friction.  Staudinger Aff. ¶ 32.  The shaped part is then cleaned and passivated[3] in a degreasing system.  *Id.* ¶ 33.  Finally, the partially complete product is annealed by a third-party. Annealment involves placing the metal parts into an oven and heating them to a certain temperature to realign the steel grains.  *Id.*  Depending on the part, it goes through the forming, degreasing, and annealing steps one or more times.  *Id.*; MacDonald Dep. Tr. 11:14-20.

During the degreasing process, the casings are submerged in a passivation bath.  The passivation chemical used in this case, MetalMedic 7017 ("MetalMedic") was supplied by Third-Party Defendant Janed.  *Id.* ¶ 10.  However, National did not use MetalMedic for passivation; instead, it used the chemical to wash and degrease the parts.  *Id.* ¶ 11.  The pacemaker battery

---

[2] The facts herein come from the evidence in the record, including Plaintiff's Complaint ("Compl.") (D.E. 1), Robert Staudinger's (President and authorized representative of National) Affirmation ("Staudinger Aff.") (D.E. 102-12), and Digby MacDonald's (National's Expert) Deposition ("MacDonald Dep.") (D.E. 102-11).

[3] Passivation is the chemical process of forming a thin, non-reactive film on steel to protect it against corrosion.  Staudinger Aff. ¶¶ 11 n.1, 35 n.4.

casings at issue went through the MetalMedic solution "one to five times for approximately [five] to seven minute exposures within the production cycle." *Id*.; MacDonald Dep. Tr. 24: 1-3 ("[T]he parts are actually exposed to the passivating solution probably for at least 24 to 30 minutes."). After being exposed to the MetalMedic, the parts are sent through a water bath to clean them. Staudinger Aff. ¶ 33.

In or about April 2011, customers of National began reporting that there were "microscopic pits on the surface of pacemaker battery cases," which resulted in customers rejecting the casings as unusable. *Id*. ¶¶ 4, 7, 14; Compl. ¶ 15. A pit renders a casing unusable when it exceeds a depth of 0.002" (two thousandths of an inch). Staudinger Aff. ¶ 5. The walls of the pacemaker battery casings are approximately 0.008-0.016 thick. *Id*. Therefore, the pits at issue in this claim, which exceed two thousandths of an inch in depth, went more "than 12.5% - 25% through the wall of the part." *Id*. National refers to these pits as "classic chloride electrochemical pitting." D.E. 97, Pl. Statement of Facts ¶ 11.

After National's customers started rejecting its parts in spring of 2011, National began investigating the cause of the chemical pitting. Staudinger Aff. ¶¶ 28, 30, 36. This effort involved "hiring experts, performing scientific laboratory analysis, inspecting 100% of outgoing parts under microscopes, consulting with customers, vendors, and otherwise conducting a company-wide study of variables that could be the cause of the pitting." *Id*. ¶ 30. This was an "all hands on deck" investigation, which required National to work at a faster pace to meet customer demands. *Id*. ¶ 36. In essence, National spent more time and used more resources to generate less product while attempting to determine the cause of the pitting.

On August 25, 2011, National ceased using MetalMedic, although it was not completely certain of the cause of the pitting. *Id*. ¶ 15. After the removal of MetalMedic, National contends

that no chemical pitting was detected in any of its parts. *Id.* ¶ 17. Between August 25, 2011 and June 2012, National continued to investigate and confirmed its theory that the cause of the pitting was the MetalMedic solution. *Id.* ¶ 18. This conclusion was determined by National's corrosion expert, Dr. Digby Macdonald, who discovered that the MetalMedic contained a higher than expected level of chlorides, which chemically corroded the stainless steel, causing the pits. *Id.* ¶ 37. Dr. Macdonald's conclusion as to causation, however, was contested by Citizens' expert.

On February 12, 2011, Plaintiff purchased from Defendant an insurance policy which provided coverage "for the building, for the business and for the stock and inventory." D.E. 94, Ex. 2 ¶ 11, Citizens' Insurance Policy (hereinafter the "Policy").[4] The Policy provided coverage to National from February 12, 2011 to February 12, 2012. *Id.* at 1. According to National, the policy is an "all risk" policy. D.E. 97, Pl. Statement of Facts ¶ 5. National reported the pitting damage to Citizens and demanded payment under the policy. Compl. ¶ 18. On or around November, 2011, Citizens accepted National's insurance claim. Staudinger Aff. ¶ 19. Subsequently, on July 26, 2012, Citizens formally denied National's claim. D.E. 94-5, Citizens' Denial Letter dated July 26, 2012 (stating that "the policy in question does not provide coverage for [National's] loss"). Plaintiff then field this suit. Plaintiff alleges that Defendants have failed to pay Plaintiff's covered claims and losses, including the following: damage to inventory and insured property, costs and expenses related to the loss, damage to personal business property, and damages resulting from business interruption and extra expenses. Compl. ¶ 36.

The Insurance Policy

---

[4] The Policy consists of numerous sections, each of which is paginated separately. However, as submitted to the Court, the Policy is also enumerated consecutively from start to finish, although this pagination was not on the original Policy. For ease of reference, the Court will cite to the consecutive enumeration that has been added to the Policy covering pages 1 through 128.

There are three sections of the Policy applicable to the current dispute: (1) the Building and Personal Property Coverage Form (Form CP 00 10) (the "BPP Form"); (2) the Cause of Loss – Special Form (Form CP 10 30) (the "Cause of Loss Form"); and (3) the Advantage Choice Property Broadening Endorsement (the "Broadening Endorsement").

The BPP Form provides that "[Citizens] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Policy at 57. "Covered Property" includes "Stock," which is defined as "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in packing or shipping." *Id*. at 71. While the BPP Form denotes losses that are covered, it does so by merely referring the Cause of Loss Form. *See id*. at 59 ("Covered Causes of Loss[:]  See applicable Causes of Loss Form as shown in the Declarations."); *id*. at 64 (referring to the "applicable Causes of Loss Form as shown in the Declarations" in describing "Exclusions and Limitations"). Additionally, the BPP Form contains a section for "Coverage Extensions," including those for "[National's] Business Personal Property." *Id*. at 62. This section permits extensions of the Policy in cases where "this policy covers [National's] Business Personal Property." *Id*. Lastly, the BPP Form describes the parties' duties in the event of loss or damage, including permitting Citizens to "inspect the property proving the loss or damage," and "to take samples of damaged and undamaged property for inspection, testing and analysis." *Id*. at 66. Likewise, National has duty to cooperate with Citizens in an investigation of loss or damage. *Id*.

The Cause of Loss Form indicates, in Section A, that a cause of loss covered under the Policy is any "Risk[] of Direct Physical Loss"[5] that is not excluded in Section B or limited in Section C of the form. *Id*. at 81. Neither party has relied on the Section C limitations and therefore

---

[5] "Risk of Direct Physical Loss" is not defined in the Policy.

6

the Court will only address the Section B exclusions.  Section B contains tiers of exclusions,
beginning with the Section B1 Exclusions, which contains an anti-concurrent causation clause
("loss or damage is excluded regardless of any other cause or event that contributes concurrently"),
as well as an anti-sequential loss clause ("loss or damages is excluded regardless of any other cause
or event that contributes . . . in any sequence to the loss").  *Id*.  B1 exclusions are not at issue in
this case, although they are pertinent to National's bad faith claim against Citizens.

The exclusions relevant to the coverage determination in this matter are found in Sections
B2, B3, and B5.  Section B2 states that Citizens "will not pay for loss or damage caused by or
resulting from" the following listed events or causes.  *Id*. at 82.  Relevant to this dispute is
Exclusion B2.d.(2), which, among other things, excludes losses caused by or resulting from "[r]ust
or *other corrosion*, decay, deterioration, hidden or latent defect or any quality in property that
causes it to damage or destroy itself[.]"  *Id*. at 83 (the "Corrosion Exclusion").  Additionally,
Exclusion B2.d.(7)(c) excludes "marring or scratching" as a cause of loss.  *Id*.  However, the
exclusions in Section B2.d are also modified so that if an excluded cause of loss results in a
"specified cause of loss," Citizens will pay for the "specified cause of loss."  *Id*.  "Specified cause
of loss" is defined in the Policy, and refers to, among other things, fire, lightning, ice or sleet.  *Id*.
at 89.

Section B3.c. excludes losses caused by, among other things, "[f]aulty, inadequate or
defective . . . workmanship."  *Id*. at 84 (the "Workmanship Exclusion").  However, the
Workmanship Exclusion contains an exception when it results in a "Covered Cause of Loss," in
which case Citizens "will pay for the loss or damage caused by that Covered Cause of Loss."  *Id*.

Section B5 is entitled "Additional Exclusion."  *Id*. at 85.  The section provides that loss or
damage to any product "caused by or resulting from error or omission by any person or entity,"

7

including outsourced products, that occurs in any stage of development or production, is excluded from coverage. *Id.* (the "Products Exclusion"). The Products Exclusion contains an exception like that found in the Workmanship Exclusion, where the exclusion does not apply when an error or omission results in a "Covered Cause of Loss." *Id.*

The third form relevant to the current dispute is the Broadening Endorsement. The Broadening Endorsement grants additional coverage by modifying the Policy with respect to the BPP, Cause of Loss, and Business Income Coverage Forms. *Id.* at 93. The portion of the Endorsement at issue here is Section 22, which extends the BPP Form to include coverage for "damage caused directly by sudden and accidental marring and scratching of . . . stock," among other things. *Id.* at 105 ("Marring and Scratching Provision").[6]

## II. PROCEDURAL HISTORY

Plaintiff initiated this action on January 16, 2013, alleging (1) breach of contract of the Policy; and (2) breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 29-40. On March 19, 2013, Defendant filed a Third-Party Complaint against Janed, asserting and preserving Defendant's right of subrogation and indemnification. D.E. 11. In a separate case, Plaintiff also sued Janed for supplying the defective product, MetalMedic. *See* Civil Action No. 13-cv-320. Plaintiff and Janed have since settled that case. Originally, National and Janed entered into a provisional, not final, settlement agreement. On February 20, 2015, Plaintiff moved for partial summary judgment regarding the provisional settlement, seeking a declaration that Defendant has no current or future subrogation rights against Janed. D.E. 74 at 4-5. Judge Chesler denied Plaintiff's motion. D.E. 74. On March 25, 2016, the parties filed the motions currently

---

[6] The Court notes that most of the key terms within the Marring and Scratching Provision, including sudden, accidental, marring, and scratching are not defined in the Policy.

pending before the Court.  D.E. 93, 94, 96, 98.  As noted above, the Court will address the motions for summary judgment first, followed by the motion on subrogation.

### III. STANDARD OF REVIEW

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter, but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial.  On claims for which the moving party does not bear the burden of proof, the movant must demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In contrast, "'[w]hen the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact.'" *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438

(11th Cir. 1991)).  This affirmative showing requires the moving party to show that "'on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'"  *Id.*

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250.  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.  The standard does not change when parties file cross-motions for summary judgment. *Morro v. DBMG Casino LLC*, 112 F. Supp. 3d 260, 276 (D.N.J. 2015).  When ruling on cross-motions, "the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Id.* (internal citations omitted).

## IV. DISCUSSION

### A. Policy Coverage, Policy Exclusions, and Related Issues

Under New Jersey law,[7] the interpretation of an insurance contract is a question of law to be decided by the Court. *Simonetti v. Selective Ins. Co.*, 372 N.J. Super 421, 428 (App. Div. 2004). A policy is interpreted according to its plain and ordinary meaning. *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010). Initially, a court must "determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a reasonable meaning to the terms." *Simonetti*, 372 N.J. Super at 428. "When the terms of the contract are clear and unambiguous, the court must enforce the contract as it is written; the court cannot make a better contract for [the] parties than the one that they themselves agreed to." *Id.*

Yet, as a general rule, coverage is to be liberally construed while exclusions are to be strictly construed. *Victory Peach Grp., Inc. v. Greater New York Mut. Ins. Co.*, 310 N.J. Super 82, 89-90 (App. Div. 1998). Although exclusionary clauses are to be construed narrowly, they will be applied where they are "specific, plain, clear, prominent, and not contrary to public policy." *Ashrit Realty LLC v. Tower Nat. Ins. Co.*, No. 1647-13T4, 2015 WL 248490, at *4 (N.J. App. Div. Jan.

---

[7] "A federal court sitting in diversity applies the choice-of-law rules of the forum state . . . to determine the controlling law." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). Under New Jersey choice of law rules, the "law of the place of an insurance contract ordinarily governs the choice of law." *Diamond Shamrock Chems. Co. v. Aetna Cas & Sur. Co.*, 258 N.J. Super 167, 198 (App. Div. 1992). Here, the Policy covered Plaintiff, a company with its principal place of business in New Jersey, and was signed by Plaintiff in New Jersey. At oral argument, both parties agreed that New Jersey law applies. If there were a conflict between the laws of competing forums, then New Jersey uses the "most significant relationship" test. *Maniscalco*, 709 F.3d at 206. The test requires courts to conduct the following two-step inquiry: (1) determine whether "an actual conflict exists between the laws of the potential forums," and (2) if there is an actual conflict, determine "which jurisdiction has 'the most significant relationship' to the claim." *Id.* (quoting *P.V. v. Camp Jaycee*, 197 N.J. 132, 144 (N.J. 2008)). The parties have not raised an actual conflict, and in any case, New Jersey has the most significant relationship to this case   The parties also frequently cited to cases from other jurisdictions. As a result, New Jersey law applies and cases cited by the parties from other jurisdictions can be persuasive authority but not binding precedent.

11

20, 2015) (internal quotation marks omitted). In addition, the insured has the burden to prove that it is covered, while the insurance company has the burden to prove that an exclusion applies. *See Zurich Am. Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55, 70 (D.N.J. 2007).

Moreover, insurance contracts are to be construed in a manner that recognizes the reasonable expectations of the insured. *Spiniello Cos. v. Hartford Fire Ins. Co.*, No. 07-2689, 2008 WL 5046831, at *2 (D.N.J. Nov. 21, 2008). If an ambiguity exists, it must be construed against the insured. *Id*. An ambiguity exists when the "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Lee v. Gen. Accident Ins. Co.*, 337 N.J. Super 509, 513 (App. Div. 2001). Thus, if the policy language would support two meanings, "one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." *Lundy v. Aetna Cas. & Sur. Co.*, 92 N.J. 550, 559 (1983).

### Coverage

The BPP form creates coverage for "Building and Personal Property," including stock. Policy at 57-68. The parties do not dispute that the metal casings at issue meet the definition of stock. Pl. Br. at 24; Def. Br. at 15. Therefore, if damage to the casings was caused by, or resulted from, a covered cause of loss, then National has coverage.

The Cause of Loss Form states that "Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations; that follow." Policy at 81.

Citizens contends that three exclusions apply: (1) the Corrosion Exclusion; (2) the Products Exclusion; and (3) the Workmanship Exclusion.[8] Def. Br. at 4. National denies that any of these

---

[8] The three exclusions at issue here do not contain anti-concurrent or anti-sequential language, although that language does appear in the Section B1 Exclusion. *See* Policy at 81 ("Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any

exclusions apply and also contends that the damage is covered by the Broadening Endorsement, which covers loss due to the accidental and sudden marring and scratching of National's products. Nat. Br. at 11-32.

The Court will address the three relevant exclusions, as well as the Broadening Endorsement, before turning to the remaining and related issues: (1) coverage for business loss and extra expense; (2) lack of cooperation; (3) bad faith; and (4) dismissal of Defendant The Hanover Insurance Group, Inc.

The Corrosion Exclusion

The Corrosion Exclusion, found in Section B2 in the Policy, states:

> [Citizens] will not pay for loss or damage caused by or resulting from any of the following:
>
> ....
>
> d. (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

Policy at 83. At the end of the list of Section B2.d. exclusions, the Policy states: "[b]ut if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a 'specified cause of loss' . . . [Citizens] will pay for the loss or damage caused by that 'specified cause of loss' . . . ." *Id.* "Specified cause of loss" is later defined in Section G2, and refers to, among other things, fire,

---

sequence to the loss."). Without such language in the relevant exclusions, when there are sequential covered and non-covered causes, "the 'efficient proximate cause' approach has generally found coverage where the covered risk was 'either the first or last step in the chain of causation which leads to the loss.'" *Lam Inv. Research, LLC v. Pub. Serv. Mut. Ins. Co.*, No. 12-5576, 2016 WL 6634931, at *4 (D.N.J. Apr. 1, 2016) (citing *Assurance Co. of Am., Inc. v. Jay-Mar, Inc.*, 38 F. Supp. 2d 349, 353 (D.N.J. 1999)). Additionally, when there are two or more causes, one covered and one not, then there is coverage. *See Ashrit*, 2015 WL 248490, at *5 ("In a situation where two or more identifiable causes-one a covered event and one excluded-may contribute to a single property loss, there is coverage absent an anti-concurrent or anti-sequential clause in the policy.") (internal quotation marks omitted).

lightning, ice or sleet. *Id.* at 89. Neither party argues that a specified cause of loss exception is applicable here.

National contends that the Corrosion Exclusion does not apply because there are concurrent causes of loss, marring and corrosion. Pl. Br. at 23. Since marring is covered under the Broadening Endorsement, which modifies and thereby preempts the Corrosion Exclusion, the loss is covered. *Id.* at 23-26. Additionally, National argues that the Corrosion Exclusion does not apply because by its terms it only applies to damage "caused by" or "resulting from" corrosion. *Id.* at 26. Here, National contends, the loss was not *caused by* corrosion, but instead the loss itself *was* corrosion. *Id.* at 26-27. Citizens asserts that the Broadening Endorsement does not apply to the Cause of Loss Form. Def. Br. at 4. Further, it claims that National's interpretation of the policy reads the Corrosion Exclusion out of the policy altogether since corrosion is always caused by something. Def. Opp'n at 10.

As plainly written, the Corrosion Exclusion excludes any loss that is "caused by" or "resulting from" corrosion. Policy at 83. Citizens claims that this distinction makes no practical difference, and cites for support *TravCo Insurance Company v. Ward*, 284 Va. 547 (2012). Citizens is correct that *TravCo* held that there no distinction between a loss caused by corrosion and corrosion itself as the actual loss. *Id.* at 558-59. However, *TravCo* was a case decided by the Virginia Supreme Court interpreting Virginia law. *Id.* at 552. Here, the Court must apply New Jersey law and thus *TravCo* holds no precedential value. New Jersey law supports a finding that there *is* a difference between the cause of a loss and the loss itself. *Simonetti*, 372 N.J. Super at 421.

In *Simonetti*, a severe rainstorm caused damage throughout plaintiffs' home. *Id.* at 424-25. Two months after this storm, plaintiffs discovered mold in their home and notified their

insurance company, Selective. *Id*. at 425. The plaintiffs' homeowners' policy covered "direct loss to property described in [the relevant coverage sections] only if that loss is a physical loss to property." *Id*. at 426. Additionally, the policy had an exclusion which stated that there was no coverage for a loss caused by mold. *Id*. Plaintiffs argued that the mold and other damage to their home was caused by water from the rainstorm, a covered loss. *Id*. at 427. Defendants, on the other hand, argued that the loss was caused by mold and therefore was excluded based on the plain language of the policy. *Id*. The issue was therefore whether there was a distinction between a loss caused by mold as opposed to when mold was itself the loss.

The *Simonetti* Court found that "[m]old can be both a loss and a cause of loss." *Id*. at 429. First, the court reasoned that the distinction between a loss that *is* mold and a loss caused *by* mold is supported by the express language of the policy. *Id*. (quoting the policy exclusion which states "[w]e do not insure, however, for loss *caused by* . . . mold . . . ."). The court in *Simonetti* found this language to clearly exclude only losses caused by or resulting from mold, not all mold-based claims. *Id*. The Appellate Division observed that "[i]f Selective had intended to exclude not only losses caused by mold, but also mold itself, it could have easily expressed that intention." *Id*. The *Simonetti* court then turned to traditional insurance contract construction, which requires courts to "interpret coverage provisions broadly and to construe exclusions and limitations narrowly," and in the case of ambiguity, "to construe the policy language against the drafter, in favor of the insured, and in accordance with the insured's reasonable expectations." *Id*. at 430. In light of this principle, the court found that it was required to "view [the] loss in the manner that brings it within the policy's coverage," and concluded that "the cost of removing the mold is not a loss separate from, or caused by, the mold itself, but rather is within the coverage provided to the homeowners

15

under defendant's policy." *Id*. In short, the Appellate Division, ruled that mold as a loss in and of itself was covered under the policy. *Id*.

The holding and reasoning of *Simonetti* applies with equal force here. The plain language of the Policy distinguishes between corrosion as a cause of loss and as the loss itself. *See* Policy at 82-83 ("[Citizens] will not pay for loss or damage *caused by or resulting from* . . . [r]ust or other corrosion.") (emphasis added). In fact, Citizens emphasized numerous times that the Court must apply the plain language and not rewrite the Policy to give either party a better deal than it bargained for. Def. Br. at 3, 5. If Citizens wanted to exclude corrosion as both a cause of loss and as a loss itself, it could have certainly written the policy that way. Since this Court is required to construe coverage broadly, exclusions narrowly, and resolve ambiguities in favor of the insured, the Court finds the Corrosion Exclusion excludes only those losses caused by or resulting from corrosion, not corrosion itself.

Having made a determination as to the parameters of the Corrosion Exclusion, the Court finds that this exclusion does not apply. This conclusion is reached for the simple reason that Citizens averred on several occasions that the corrosion itself was the loss rather than the cause of the loss. *See* Def. Opp'n at 13 ("there is only one loss; the corrosion of National's products"); 15 ("there is only one loss here – the corrosion damage"); Def. Br. at 5 (noting twice that the loss was "chemical corrosion"); D.E. 99, Def. Statement of Facts ¶ 12 ("The 'pitting' that affected certain of National's battery casings is properly characterized as corrosion."). Since Citizens has acknowledged that loss was the corrosion itself, rather than caused by corrosion, the exclusion does not apply pursuant to the Policy's plain terms.

<u>Products Exclusion</u>

The second relevant exclusion, found in Section B5, is the "Products Exclusion," which provides as follows:

16

5. Additional Exclusion

The following provisions apply only to the specified property.
LOSS OR DAMAGE TO PRODUCTS

[Citizens] will not pay for loss or damage to any merchandise, goods
or other product caused by or resulting from error or omission by
any person or entity (including those having possession under an
arrangement where work or a portion of the work is outsourced) in
any stage of the development, production, or use of the product,
including planning, testing, processing, packaging, installation,
maintenance or repair.  This exclusion applies to any effect that
compromises the form, substance or quality of the product. But if
such error or omission results in a Covered Cause of Loss, [Citizens]
will pay for the loss or damage caused by that Covered Cause of
Loss.

Policy at 85.  Citizens alleges that the language of the Products Exclusion is clear – it applies to

"any merchandise, goods or other product caused by or resulting from error or omission by *any*

person . . . . "  Def. Opp'n at 12 (emphasis in original).  Here, according to Defendant, the loss was

caused by Janed's "error or omission" in supplying the faulty MetalMedic solution.[9]  Citizens

continues that since Janed is *any* person, the plain language dictates that the exclusion applies.  *Id.*

at 13.

National responds that this exception only applies to an error or omission by "those having

possession under an arrangement where work or a portion of the work is outsourced," and since

Janed never had possession of the stock, this exclusion does not apply.  Pl. Br. at 32.  National

distinguishes the cases cited by Citizens, pointing out that the cases do not indicate that the

exclusions at issue were subject to an ensuing cause of loss provision or a broadening endorsement,

as is the case here.  Pl. Opp'n at 12.

---

[9] Citizens admitted to this cause of loss solely for the purposes of summary judgment.  Def. Br. at
1 n.2.  Citizens' expert found a different cause, which is subject to the *Daubert* motion that the
Court does not reach here.

Assuming National's position is correct, that the loss was caused by Janed's MetalMedic solution, this exclusion applies.   National's argument that only the parenthetical "including" applies to Janed's conduct is without merit.  "Including" is defined as "to contain, as a whole does parts or any part or element."  *Including*, Random House Webster's Unabridged Dictionary (2d ed.).  By definition, the word "including" is not exclusive or limiting.  The parenthetical does not limit the exclusion to instances in which Janed had actual possession of the casing.  Moreover, Janed certainly meets the requirement of "any person"; the provision was not limited to National.  In short, the error and omission by Janed in supplying the faulty MetalMedic, caused the loss.  Therefore, by its plain terms, the damage at issue here falls into the Products Exclusion unless the exception to the exclusion applies.

Workmanship Exclusion

Section B3.c, the Workmanship Exclusion, states in relevant part:

> 3. [Citizens] will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c.
>
> . . .
>
> c. Faulty, inadequate or defective:
> . . .
>
> (3) Materials used in repair, construction, renovation or remodeling[.]

Policy at 84.  Citizens contends that the Workmanship Exclusion applies because the finished product here was defective, and New Jersey case law holds that these types of exclusions bar coverage for damage caused by a flaw in the process or finished product.  Def. Opp'n at 14; Def. Br. at 10.  Citizens further argues that the Policy does not indicate that it has to be the insured's workmanship that is "faulty, inadequate or defective" for the exclusion to apply.  Def. Br. at 10.

Additionally, Citizens states that "[a]pplication of the workmanship exclusion is appropriate because it prevents the insured from obtaining coverage for its own inability to produce

18

a defect-free product, or from obtaining coverage for an aspect of its process over which it uniquely has control." Def. Opp'n at 14. Citizens also refutes National's suggestion that the exclusion only applies to real property, since the terms of the exclusion state it applies to "any property." Def. R.Br. at 6. Since the pitting would not have occurred absent the faulty workmanship, Citizens concludes that the damage is excluded by this provision. Def. Opp'n at 14.

National argues that the cases cited by Citizens are distinguishable because they only apply to real property. Pl. Opp'n at 15. The sole case that does not deal with real property, *H.P. Hood LLC v. Allianz Global Risks U.S. Insurance Company*, is nonetheless distinguishable according to National since the damage to the product that occurred there was part of the product itself, rather than damage that was caused by an outside chemical, as is the case here. 88 Mass. App. Ct. 613 (2015). National asserts that, therefore, the losses here were not caused by the manufacturing process itself (but by an outside source), and therefore it falls outside of the exclusion. Pl. Br. at 30. Even if there was a defect in the process, National continues, the exclusion itself does not contain the word "process," and the Court should not rewrite the exclusion in Citizens favor. *Id*. Further, National argues that the process during the period of pitting was working properly, making the exclusion inapplicable to the damage here. *Id*.

Citizens correctly notes that a workmanship exclusion encompasses both a flawed product as well as flawed process. *See, e.g., Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274, 281 (D. Conn. 2005); *L.F. Driscoll Co. v. Am. Protection Ins. Co.*, 930 F. Supp. 184, 188-89 (E.D. Pa. 1996). This exclusion appears to apply because National used MetalMedic in its manufacturing process. Indeed, the heart of National's claim is that its loss was caused by the use of the faulty MetalMedic in its manufacturing process. National argues that any faulty, inadequate, or defective workmanship occurred on Janed's premises, when Janed made the defective

19

MetalMedic. The Court disagrees. While the deficient MetalMedic was in the possession of Janed, it only posed a risk of loss. It was not until the chemical was actually used by National in its manufacturing process that risk resulted in actual damage to the casings and loss to National. *Cf. Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 98 N.J. 18, 27-28 (1984) (ruling that an occurrence of an accident or tort, covered by insurance, is at the time the insured is actually damaged rather than when the underlying wrongful act is committed).[10] Thus, like the Products Exclusion, the Workmanship Exclusion applies unless its exception is applicable.

<u>Exceptions to the Products and Workmanship Exclusions</u>

Both the Products Exclusion and the Workmanship Exclusion contain an exception for a "Covered Cause of Loss." The Products Exclusion states that when an "error or omission results in a Covered Cause of Loss, [Citizens] will pay for the loss or damage caused by that Covered Cause of Loss." Policy at 85. Similarly, the Workmanship Exclusion states that "if an excluded cause of loss that is listed in . . . [B]3.c. results in a Covered Cause of Loss, [Citizens] will pay for the loss or damage caused by that Covered Cause of Loss."[11] *Id.* at 84. In a case cited by both

---

[10] Subsequently, in cases involving environmental pollution and toxic-tort claims, the Supreme Court of New Jersey determined liability coverage using the "continuous trigger rule." *See, e.g., Quincy Mut. Fire. Ins. Co. v. Borough of Bellmawr*, 172 N.J. 409, 419-24 (2002). Other than those types of cases, the Supreme Court of New Jersey did not disturb its holding in *Hartford*. *Id.* at 419.

[11] The parties analyzed these exceptions pursuant to the ensuing loss doctrine in addition to other arguments. *See* Pl. Br. at 32; Def. Br. at 12 n.4. The Court, however, does not find that the ensuing loss doctrine is applicable. "Ensuing loss" is a term of art within the insurance industry. As a result, cases that analyze such a provision involve policies in which the term ensuing loss, or some clear derivation thereof, is used. *See, e.g., GTE Corp. v. Allendale Mut. Ins. Co.*, 258 F. Supp. 2d 364, 370-71 (D.N.J. 2003) (exclusions contain clause stating they apply "unless loss or damage from a peril insured herein *ensues* and then this policy shall cover for such *ensuing loss or damage*" (emphases added)); *Ariston Airline & Catering Supply Co. Inc. v. Forbes*, 211 N.J. Super 472, 478 (Super Ct. Law Div. 1986) (ensuing loss clause states that the exclusion applies "unless loss by a peril not otherwise excluded *ensues* and then the Company shall be liable for only such *ensuing loss*." (emphases added)). In this matter, the exclusions do not use the term "ensuing loss" or a

parties, *Stack Metallurgical Services, Incorporated v. Travelers Indemnity Corporation of Connecticut*, No. 05-1315, 2007 WL 464715 (D. Or. Feb. 7, 2007), the court confronted exclusions with similar exceptions to those found in the Products and Workmanship Exclusions.

*Stack* involved a metallurgical company that specialized in heat-treating metal parts. *Id.* at *1. In conjunction with its business, Stack purchased insurance from Travelers Indemnity Company. *Id.* When a Stack employee left a hammer containing lead in a furnace used to heat its parts, it disintegrated and caused the furnace to be contaminated with lead particles. *Id.* Stack notified Travelers of the damage, seeking reimbursement under the policy. *Id.* at *2. Among other issues, the court addressed the adequacy of a workmanship exclusion contained in the Travelers policy. *Id.* at *6. The provision excluded payment for loss or damage caused by "faulty, inadequate, or defective . . . [d]esign, specifications, workmanship, repair, construction . . . or [maintenance] of part or all of any property on or off the described premises." *Id.* Additionally, the exclusion contained an exclusion which stated that "if an excluded cause of loss . . . results in a Covered Cause of Loss, [Travelers] will pay for the loss or damage caused by that Covered Cause of Loss." *Id.*

The Court ultimately found that:

> [t]he convoluted exceptions to the exclusions[12] noted above are circular, incomprehensible, or ambiguous, and would render the exemptions for workmanship and maintenance, contamination, and pollution invalid. These exceptions to the exclusions first state that defendant will not pay for any damages resulting from the excluded

---

derivation of the term but instead explicitly reference the "Covered Cause of Loss," which is a term expressly set forth in the Policy. The Court would have to ignore the plain language of the Policy to read ensuing loss into the exceptions.

[12] There were two additional exclusions for "contamination" and "pollution" respectively in *Stack*. The contamination and pollution exclusions contained a "specified cause of loss" exception. *Id.* at *6. In the insurance policy at issue in *Stack*, "specified cause of loss" was not defined. *Id.* Therefore, the court analyzed all three exclusions together. *Id.*

causes, but will pay if the excluded cause of loss results in a "covered" cause of loss or results in a "specified cause of loss." The only definition of "covered causes of loss" in the Deluxe Property Coverage Form identifies compensable causes of loss as "risks of direct physical loss." (The term "specified causes of loss" is not defined, or distinguishable from "covered causes of loss.")  Given that the policy applies to only "covered causes of loss," which are defined as "risks of direct physical loss," it is difficult to discern the intended meaning of provisions that first exclude payment for losses resulting from causes such as faulty maintenance, contamination, and pollution, and then negate those exclusions if these result in a "covered cause of loss" or "specified cause of loss."  Plaintiff's contention that these exclusionary clauses are circular has merit, as the exclusionary clauses in question appear to first negate coverage, and then to restore coverage by negating that negation.

If the exclusions and limitations do not restore the coverage that is negated, they are ambiguous and subject to more than one plausible interpretation.  Such provisions in insurance policies are construed against the drafters, which are the companies issuing the policies.

*Id.* at *7 (internal footnote omitted).  The *Stack* Court therefore determined that the workmanship exclusion, among others, was ambiguous, noting that the "covered cause of loss" referenced therein was vaguely defined as "risks of direct physical loss."  *Id.*

While *Stack* is not binding on this Court, the Court finds the reasoning in *Stack* to be persuasive and adopts it here.  Critically, the policy language at issue in *Stack* was extremely similar to the exclusions and exceptions here.  The exceptions contained in the Products and Workmanship Exclusions at best render the exclusions ambiguous and at worst incomprehensible.  In light of causes of loss that are covered, the exclusions, and the exceptions to the exclusions, the policy language is circular.  Under the Covered Cause of Loss section, all risks of direct physical loss are covered unless an exclusion or limitation applies.  The exclusions then negate coverage under the Policy, unless the exceptions apply.  The exceptions to the exclusions return the policyholder to the very place he started – the Covered Cause of Loss.  The process then begins

22

anew – covered causes of loss, exclusions, exceptions to the exclusions, and a return to covered causes of losses. Hence, the circular nature of the policy language.[13]

Citizens relies on *Homesite Insurance Company v. Hindman*, 413 N.J. Super. 41, 47 (App. Div. 2010), for the proposition that a court "will not read one policy provision in isolation when doing so would render another provision meaningless." This argument is misplaced. The *Hindman* court was referring to two separate policy provisions, a business exclusion provision and a rental exclusion provision. *Id*. Here, two separate provisions in the Policy do not arguably contradict each other. Instead, both exclusions contain within their own provisions the incongruous exception language. However, the Court does find *Hindman* instructive as to a relevant point of insurance contract construction. As to ambiguities in an insurance contract, the *Hindman* Court wrote that "[c]ourts should examine whether more precise policy language, if chosen by the insurance company, would have 'put the matter beyond reasonable question.'" *Id*. at 46 (citing *Doto v. Russo*, 140 N.J. 544, 557 (1995)). Here, Citizens could have merely excluded the contradictory exception to the exclusions, but it did not do so. In addition, if Citizens intended the exceptions to apply to ensuing losses, *see* note 11, *supra*, it could have used that language rather than referring to a specific term in the Policy, Covered Cause of Loss. More precise policy language was clearly available to Citizens, but it did not use it. As a result, the exceptions contained in the Products and Workmanship Exclusions are construed against Citizens, and National's loss is covered.

---

[13] The Court recognizes that there could arguably be another interpretation of the exceptions to the two exclusions due to the Policy's use of the word "results" in the exceptions. However, as noted, under New Jersey principles of insurance contract construction, if two reasonable interpretations of insurance policy language exist (thereby rendering the language ambiguous as a matter of law), the Court is to construe the policy in favor of the insured, here National.

Because the Court finds that National has coverage, the Court does not need to reach the Broadening Endorsement and the myriad of issues presented by both parties, chief among them that none of the key terms - sudden, accidental, marring, or scratching – are defined in the policy. For similar reasons, the Court does not need to reach the *Daubert* question raised by National.[14] National's *Daubert* motion concerned Citizens' expert's opinion concerning the Broadening Endorsement as well as causation as to the actual impact that the MetalMedic had on the casings.

<u>Business Loss and Extra Expense</u>

Citizens also moves for summary judgment on National's claims for business income loss and extra expense. National opposes Citizens' motion, but has not cross-moved for summary judgment on this section of the policy.

The Policy contains a "Business Income (and Extra Expense) Coverage Form." Policy at 72. Part A of this Form applies to "Coverage." *Id.* Section A1 defines "Business Income," which includes: "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll." *Id.* Section A1 provides coverage for loss of business income pursuant to the following provision:

> [Citizens] will pay for the actual loss of Business Income [National] sustain[s] due to the necessary "suspension" of [National's] "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

*Id.*

---

[14] As stated during oral argument, the Court has concerns about the factual bases of certain opinions offered by Citizens' expert witness. The Court concluded that, if necessary, a *Daubert* hearing would ensue. In light of the Court's decision concerning coverage, the hearing is unnecessary.

Section A2 goes on to define "Extra Expense," which, in relevant part, states as follows:

> b. Extra expense means necessary expenses [National] incur[s] during the "period of restoration" that [National] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.
>
> [Citizens] will pay Extra Expense (other than the expense to repair or replace property) to:
>
> (1) Avoid or minimize the "suspension of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.
>
> (2) Minimize the "suspension" of business if [National] cannot continue "operations".

*Id.* "Extended Business Income" is also covered by Section A.5.c.(1), which states:

> (1) Business Income Other Than "Rental Value"
>
> If the necessary "suspension" of [National's] "operations" produces a Business Income loss payable under this policy, [Citizens] will pay for the actual loss of Business Income [National] incur[s] during the period that:
>
> (a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and
>
> (b) Ends on the earlier of:
>
>> (i)    The date [National] could restore [its] "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or
>>
>> (ii)   30 consecutive days after the date determined in (1)(a) above.

*Id.* at 74.

Definitions are found in Section F, which defines "operations," "period of restoration," and "suspension," among others. *Id.* at 80. "Operations" is defined as: "a. [National's] business

activities occurring at the described premises; and b. [t]he tenantability of the described premises, if coverage for Business Income including 'Rental Value' or 'Rental Value' applies." *Id.* Period of restoration is defined as the "period of time that:"

> a. Begins:
>
>> (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or
>>
>> (2) Immediately after the time of direct physical loss or damage from Extra Expense Coverage;
>> caused by or resulting from any Covered Cause of Loss at the described premises;
>
> and
>
> b. Ends on the earlier of:
>
>> (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality;
>> . . . .

*Id.* The last relevant definition states that "suspension" means "[t]he *slowdown* or cessation of [National's] business activities." *Id.* (emphasis added).[15]

Citizens argues that National did not "suspend" its operations as a result of the chemical corrosion problem it experienced in 2011, and therefore business income and extra expense coverage is not available. Def. Br. at 18. Since National itself admitted that it operated at an accelerated pace to produce a sufficient supply of non-defective battery casings to meet customer requirements, Citizens suggests it would be inconsistent to find that National's operations were "suspended." *Id.* Citizens additionally argues that even if the Court finds a suspension of operations, it would have to "rest on the theory that a decreased yield of salable product qualifies

---

[15] Additionally, the Broadening Endorsement modifies the Business Come Coverage Form in two sections. *Id.* at 96. It expands the property that falls under "Business Personal Property," as well as the income and extra expense from dependent properties. *Id.*

as a 'suspension.'" *Id*. at 19. However, Citizens continues, the decreased yield of salable product was not caused by property damage, but instead by "National's ongoing inability to determine what was wrong with its manufacturing process and why some of its battery casings were manifesting chemical corrosion." *Id*.; Def. R.Br. at 9 (stating that the cause of National's "suspension of its operations" was "National's inability for a period of time to ascertain the cause of the corrosion problem.") Since it was National's inability to troubleshoot and fix its manufacturing process that caused the suspension, the suspension was not the result of the direct physical loss, according to Citizens. *See* Def. Br. at 20-21 (citing cases that have held that "business income coverage is not available when property damage is not the actual, direct cause of an insured's suspension of operations.").

National responds that its increased costs in producing a lower amount of product during the critical period meets the definition of "suspension" under the policy. As to determining the cause of the pitting, National points to the painstaking, thorough, costly, and time-consuming process it undertook. Pl. Opp'n at 18-19. For example, National claims that it inspected and re-inspected each batch of casings and also recreated parts needed to meet customer demand. *Id*. at 19. National further cites to the many additional work hours its employees endured and the concomitant increase in overtime that National had to pay. Additionally, National continues, each batch of casings that exhibited a high failure rate had to be inspected under a microscope to try to identify the cause of the pitting, which was not only time-intensive, but involved specialized training for workers. *Id*. Due to the labor intensive nature of reviewing a bad batch, National performed a cost-benefit analysis on each batch that required review, and some batches had to be scrapped all-together. *Id*. at 24. All of this work, National claims, "increased costs of production, decreased sales, and decreased profitability," since National had to pay its workers overtime, divert

resources, and focus all its efforts on stopping the pitting. *Id*. at 19-21. National argues that all of its efforts were taken in a good faith attempt to mitigate the losses. *Id*. at 21. National also points to the catch-22 situation it faced. National explains that if it had shut down its business entirely the income losses would have been far greater than the losses actually sustained, and "Citizens would now be arguing that [National's] failure to mitigate was the actual cause of the loss." *Id*. at 26.

Importantly, "suspension" is not defined as a complete cessation of business activities, but includes a "slowdown" of such activities. Policy at 80. "Slowdown" is not defined in the Policy. However, a common definition of "slowdown" means "a slowing down or delay in progress, action, etc." *Slowdown*, Random House Webster's Unabridged Dictionary (2d ed.). Citizens does not contest that National's production decreased while its efforts and costs increased during the critical period. The Court finds that the present facts support a finding that National suffered a "slowdown" in its business activities. Specifically, National expended more resources (in both hours and costs) to produce less of its product.

Additionally, business income includes net income that would have been earned as well as payroll and other normal operating expenses. Extra expense is defined in the Policy as the necessary expenses National incurred during its "period of restoration." Policy at 80. The period of restoration ends the date when the property at the described premises should be repaired, rebuilt, or replaced with *reasonable* speed or similar quality. *Id*. Citizens contends that National cannot recover due to its failure to detect the problem in its manufacturing process. However, outside of its conclusory allegation, Citizens presented no evidence demonstrating that National did not act *reasonably* in determining the cause of the pitting. To the contrary, National presented evidence

which, if believed, could lead a reasonable juror to conclude that National took all reasonable steps within its power to locate the source of the problem and take appropriate corrective action.

Moreover, extra expense coverage includes costs incurred to "[a]void or minimize 'suspension' of business and to continue operations." Policy at 72. Again, National's evidence supports a finding that the additional costs it incurred were to minimize the slowdown in its operations. Citizens failed to present adequate evidence to support its position, much less demonstrate that it is entitled to judgment as a matter of law.

In addition, the cases cited by Citizens are clearly distinguishable from the current situation. Among others, Citizens relies upon *United Airlines v. Ins. Co. of the State of Pennsylvania*, 385 F. Supp. 2d 343, 351 (S.D.N.Y. 2005), and *Paradies Shops, Inc. v. Hartford Fire Ins. Co.*, No. 03-3154, 2004 WL 5704715, at *6 (N.D. Ga. Dec. 15, 2004). In *United Airlines*, the insured airline sought coverage for losses due to business interruption following the 9/11 attacks. The airline argued that it suffered property damage, which was necessary to trigger coverage, when one of its ticket counters was destroyed and one of its gates was impacted by the terrorist attacks. *United Airlines*, 385 F. Supp. 2d at 350. While the airline had coverage for any business interruption related to the counter and the gate, the court in *United Airlines* ruled that the insured could not recover for the remainder of its business interruption, which was caused by suspension of all air traffic following the attacks. *Id*. at 350 -51. Similarly, in *Paradies Shops*, the insured claimed a loss of business income due to a hurricane that never actually caused any damage to the business. 2004 WL 5704715, at *6. Instead, the insured's lost business was due to a prophylactic evacuation order. *Id*. Here, by comparison, there are sufficient facts to support a finding that the business income loss and extra expenses were directly caused by the pitting in the casings and National's resulting efforts to find the cause of the pitting, making both *United Airlines*

and *Paradies Shops* inapposite. In fact, *United Airlines* supports this conclusion because business interruption losses were covered insofar as the losses related to the counter and the gate damage.

For the foregoing reasons, Citizens motion for summary judgment as to the business income and extra expense coverage is denied.

Failure to Cooperate

National requests that the Court find that it did not fail to cooperate with Citizens, as was required pursuant to the Policy. Pl. Br. at 34-37. The cooperation requirement is found in Section E.3.a. of the BPP form. Policy at 66. The pertinent part of the section requires National to cooperate with Citizens in the investigation or settlement of the claim as well as permit Citizens to inspect the property and take samples of the damaged property. *Id*.

National claims that it cooperated with Citizens as required by the policy. Pl. Br. at 34-37. In support, National points to a letter written by its public adjuster to Citizens on May 10, 2012. *Id*. at 35-36. The letter refers to voluminous documents that National has and offers, as an alternative to producing all the records, an in-person meeting during which the adjuster could review the process with Citizens. *Id*. at 35. National claims that Citizens declined the in-person meeting and decided not to review National's root cause analysis. *Id*. at 36. Additionally, National states that there is no prejudice to Citizens since even with the benefit of all the documents now produced, Citizens has maintained its denial of coverage. *Id*. at 37.

Citizens responds that National failed to cooperate because it intentionally suppressed two reports that National received early in its investigation: a June 27, 2011 Metallurgical Associates Report (the "MAI Report"), and a document entitled "Experiments Derived from DOE Results." Def. Opp'n at 15-16. The MAI Report indicated that MetalMedic was a factor in the pitting but not the sole or primary factor. *Id*. at 15. The DOE Results suggested replacing certain substances in the manufacturing process to determine if oils were contaminating parts. *Id*. at 16. Citizens

30

contends that these documents, which were created prior to National advocating its root cause analysis, "cast doubt on National's contention that the passivation agent[, MetalMedic,] was the cause of the chemical corrosion." *Id.* Citizens additionally suggests that National hid these documents from its own public adjuster in order to prevent him from sending them to Citizens. *Id.* at 18.

In reply, National argues that the two documents are "inadmissible, inauthentic, incomplete, hearsay documents." Pl. R.Br. at 12. National claims these documents were merely preliminary views based on less than complete information developed early on in the investigation. *Id.* at 12-13. Additionally, according to National, MIA later supplemented its report to clarify that "the sole and primary cause of the pitting was [MetalMedic]." *Id.* at 14.

The Court first observes that the admissibility, authenticity, completeness, and hearsay nature of the documents has no bearing on the Court's analysis. The Court is not being asked to admit the documents into evidence at trial. The issue is whether, while in possession of the documents, National had to make Citizens aware of the documents (or produce them), in order to fulfill its duty to cooperate under the Policy.

However, the Court finds that it does not need to engage in this analysis for a separate reason. Both parties agree that to prevail, Citizens has to show not only that National did not cooperate, but also that Citizens suffered "appreciable prejudice" as a result. *See Travelers Cas. & Sur. Co. v. Becton Dickinson & Co.*, No. 14-4410, 2016 WL 3769747, at \*4 (D.N.J. July 12, 2016). The parties agree that the Policy is an occurrence-based, as opposed to a claims-based, policy.[16] Under New Jersey law, when dealing with an occurrence-based policy, an insurance

---

[16] The crucial difference between an occurrence-based and a claims-based policy is that claims-based policies "only cover claims that are actually made by the insured during the policy period." *Travelers Cas. & Sur. Co. v. Becton Dickinson & Co.*, No. 14-4410, 2016 WL 3769747, at \*3

company must show that it suffered "appreciable prejudice" as a result of an insured's failure to cooperate *Id.* (holding that in occurrence-based policies, New Jersey courts have required that the insurer show that it has suffered appreciable prejudice as a result of an insured's late notice of its claim); *Hager v. Gonsalves*, 398 N.J. Super 529, 534 (App. Div. 2008) (concluding that "an insurer must show that it was appreciably prejudiced by its insured's failure to cooperate in order to disclaim coverage based on that failure"). In determining whether a party has suffered appreciable prejudice, courts generally consider two factors: (1) whether "substantial rights have been irretrievably lost" by virtue of the insured's failure, and (2) "the likelihood of success of the insurer in defending against the accident victim's claim" had the breach not occurred. *Hager*, 398 N.J. Super. at 536.

Here, the Policy is occurrence-based, and therefore the appreciable prejudice standard applies. While Citizens agrees it must show appreciable prejudice, it fails to set forth facts, much less conduct an analysis, demonstrating that it suffered appreciable prejudice. Notably, Citizens' conclusion regarding its coverage of the claim did not change once it received the MAI Report or the DOE Results. Therefore, Citizens has not demonstrated that it suffered appreciable prejudice or raised a genuine issue of material fact on this point. As a result, the Court will enter summary judgment in favor of National on the issue of cooperation.

---

(D.N.J. July 12, 2016). Thus, "[t]imely notification by the insured of the claim" is part of a claims-based policy, whereas occurrence-based policies cover events that occur "while the policy is in effect, even if the insured does not learn of the claim until after the policy has expired." *Id.*

Bad Faith

National argues that it is also entitled to summary judgment on its bad faith claim, that is, Citizens acted in bad faith in denying coverage under the Policy. [17] Pl. Br. at 37-40. Citizens likewise seeks summary judgment, requesting that the Court reach the opposite conclusion - Citizens did not act in bad faith. Def. Br. at 21-23. Under New Jersey law, if an insurance company's reasons for denying coverage are "fairly debatable," then the insurance company cannot be liable for bad faith. *Pickett v. Lloyd's*, 131 N.J. 457, 473 (1993). Therefore, if there is a reasonable basis for denial of benefits, a claim for bad faith must be dismissed.

National argues that Citizens' denial of its claim was not fairly debatable. Pl. Br. at 37. The crux of National's argument is that Citizens "materially misrepresented the exclusions it relied upon by including anti-concurrent/anti-sequential language in the denial letter." *Id*. Since the anti-concurrent/anti-sequential language only applied to the Section B1 exclusions, which were not cited or relied upon by Citizens in denying National's claim, National concludes that Citizens intentionally misrepresented the policy language to make coverage appear narrower than it actually is. *Id*. at 38. Further, National claims that it is irrelevant that "National was represented by a public adjuster" who was not misled by the denial letter. Pl. R.Br. at 10. National also notes that Citizens' internal adjuster first stated, in an internal email, that the loss was covered, and then later

---

[17] It is not lost on the Court that both parties essentially accuse the other of bad faith. National says so explicitly and Citizens implicitly, claiming that National hid its two earlier reports addressing the cause of the pitting. Similarly, it is not lost on the Court that both parties give the same excuse, at least in part, for their respective failures – that they were preliminary opinions given without the benefit of full information. Citizens claims that its adjuster's internal email was a preliminary view which was explained during the adjuster's deposition testimony, where he testified that he did not fully understand National's process when he wrote the internal email at issue. National, likewise, says that both reports, which were not disclosed to Citizens until formal discovery in this case, merely consisted of preliminary views without the benefit of a complete investigation.

denied coverage by misrepresenting the Policy. Pl. Opp'n at 26. Thus, National concludes that Citizens lacked a good faith, reasonable basis to deny coverage. *Id.*

Citizens responds that it had a reasonable basis to deny National's claim. Def. Opp'n at 18. First, Citizens contends that National did not sufficiently preserve the issue of bad faith, having failed to plead it in its Complaint or clearly set it forth in its responses to interrogatories. *Id.* at 19-21. Since this claim is not pled in National's complaint nor included in discovery responses, it should not be able to raise this claim for the first time at summary judgment, according to Citizens. *Id.* at 22. Further, Citizens contends that the erroneous language concerning causation and sequence in the denial letter was simply a mistake, and nowhere does National state that it was actually confused or misled by the language. *Id.* at 23.

As to Citizens' adjuster's internal email indicating that it appeared that National had coverage, Citizens responds that the adjuster's view was merely preliminary and without complete information. The email also referred to potential exclusions, and the adjuster adequately explained why he changed his initial view. *Id.* at 3-4. Citizens points out that the adjuster testified that when he wrote the internal email, he did not realize that the casings in question were actually immersed on several occasions as opposed to merely once. *Id.* at 3. Citizens therefore concludes that the denial was, at a minimum, "fairly debatable."

The Court first notes that Citizens raised the issue of waiver, claiming that National failed to adequately plead bad faith, at the summary judgment stage. However, this is an argument that should have been raised at the motion to dismiss stage. Notably, Plaintiff's second count is for a breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 37-40. In the count, National expressly pled that Citizens denied coverage "for reasons that are not even debatably valid[.]" As noted, the "reasonably debatable" standard is applied to a claim of bad faith denial of

insurance coverage. It is not appropriate for the Court to rule on whether a claim was plausibly pled at the summary judgment stage. *See, e.g., In re Compensation of Managerial, Prof'l & Tech. Emps. Antitrust Litig.*, No. 02-2924, 2008 WL 3887619, at *11 (D.N.J. Aug. 20, 2008) ("But plausibility is not the standard on a motion for summary judgment.").

National's bad faith claim is essentially based on two events. The first is that Citizens' adjuster initially indicated, in an internal email, that National's damage met the definition for marring under the broadening endorsement. However, as Citizens points out, this email also refers to exclusions that could apply. Thus, the critical email fails to support National's repeated allegation that the email unequivocally reflects that Citizens believed that National had coverage. Instead, the email itself states that exclusions may apply which would negate coverage.

The second event is that Citizens' denial letter wrongly cited to the anti-sequential/anti-consequential modifiers concerning the applicable exclusions. This was clearly an error, as Citizens admits. However, the Court does not find bad faith, or a reasonable basis to find bad faith, because (1) Citizens never pressed forward with either limitation as to sequence or consequence; and (2) Citizens took the same position regarding denial of coverage without reference to either limitation. If the facts were different, for example if National had evidence that Citizens denied the claims believing that they were in fact covered, but attempted to pull a sleight of hand by pointing to irrelevant policy provisions, the Court's decision concerning bad faith could be different.

Therefore, summary judgment in favor of Citizens as to bad faith is granted.

### Dismissal of Hanover

Finally, Citizens asks that Hanover be dismissed because it did not issue, and is thus not a party to, the insurance policy. Def. Br. at 23. National replies that the Hanover logo is on the Policy, and that the Policy was certified as authentic by an employee of "Citizens/Hanover

35

Insurance Company." Pl. Opp'n at 27. Citizens responds that the Policy clearly provides that Citizens is the company providing insurance, not Hanover. Def. R.Br. at 12.

The Court looks to the Policy itself to determine who issued coverage. While Hanover's logo is on the policy, the substance of the Policy clearly identifies Citizens as the insurance provider. The first page of the Policy has Citizens' name in bold at the top of the page, and, more importantly, indicates that coverage is provided by Citizens. Policy at 1. In addition, only representatives of Citizens (its President and Secretary) signed the declarations page. *Id.* at 27. Despite the Hanover logo, the policy nowhere indicates that Hanover is providing coverage. Therefore, Citizens' request is granted and Hanover is dismissed from the case.[18]

### B. Subrogation

Turning to the subrogation motion, National asks this Court to find that Citizens is precluded from seeking subrogation from Janed. National previously made a similar motion, which Judge Chesler denied in an opinion and order on April 15, 2015. D.E. 74.[19] At the time, National had reached a provisional settlement agreement with Janed stemming from National's separate suit against Janed. *Id.* at 2. National thereafter sought a finding that Citizens had no present or future subrogation rights and asked Judge Chesler to adopt the "absolute-waiver rule." *Id.* The rule provides that an insurance company waives its rights to subrogation if it does not make payments under the policy. *Id.*

Judge Chesler denied National's request for three reasons. Judge Chesler first explained that such an order would amount to a prohibited advisory opinion because the underlying

---

[18] Citizens appears to be a member of the Hanover Insurance Group. Hanover is the holding company for several property and casualty insurance companies.

[19] *National Manufacturing Co. v. Citizens Ins. Co. of Am., et al.*, 2015 WL 1735423 (D.N.J. April 15, 2015).

settlement was not yet final. *Id.* at 4-5. Next, the judge ruled that material issues of fact existed as to Janed and National's allocation in the provisional settlement agreement of covered versus uncovered losses. *Id.* at 5. Finally, Judge Chesler recognized that the absolute-waiver rule had not been adopted in New Jersey, so the Court was reluctant to create new state law in this diversity action. *Id.* at 5-6.

Since Judge Chesler's ruling, National and Janed have finalized their settlement agreement. Relying on *American Reliance Ins. Co. v. K. Hovnanian at Mahwah IV, Inc.,* 337 N.J. Super. 67 (App. Div. 2001), National now argues that Citizens does not have subrogation rights because it failed to make payments to National. Pl. Subrogation Br. at 7-10. National further claims that Citizens waived its rights to seek subrogation because it denied National's claims in bad faith. *Id.* at 10-12. National also cites to the "made whole doctrine," arguing that it must be made whole as to both its insured and non-insured losses. *Id.* at 12-14. Janed joins National's motion, agreeing that Citizens can only obtain subrogation rights if it first pays National, which did not occur. D.E. 111. Janed also asserts that Citizens can no longer attain subrogation rights because National has settled its case with Janed. *Id.*

Citizens opposes the motion, arguing that National's release of Janed does not bar Citizens' subrogation claims because both National and Janed knew that Citizens was seeking subrogation. Def. Subrogation Opp'n at 3-4. Citizens claims that this position is well-settled in New Jersey and points to *Nucci v. The American Ins. Co.*, No. A-0147-13T1, 2014 WL 6977767 (App. Div. Dec. 11, 2014) (unpublished) in support. *Id.* at 4-7. Citizens adds that it has standing on the subrogation claim even if it has not yet paid the underlying claim. *Id.* at 8-11. Citizens continues that the absolute waiver does not apply in New Jersey and that it has not acted in bad faith. *Id.* at 11-12. Citizens next asserts that National's made whole argument fails because Judge Chesler denied the

prior motion due to material issues of fact and no new facts have been presented since. *Id.* at 16-19. Finally, Citizens argues that National and Janed colluded as to the amounts paid by Janed. *Id.* at 19-21. Citizens explains that Janed and National improperly agreed that Janed's payments (for example, for alleged loss of goodwill) were different from the claims that Citizens would pay if liable under the policy.[20] *Id.*

In reply, National indicates that it is not challenging Citizens' standing and it is not raising the absolute-waiver rule. Pl. Subrogation R.Br. at 7. National states that Citizens cannot maintain a subrogation action merely through pre-settlement notification to Janed of the subrogation claim. *Id.* at 6-7.

In *Hovnanian*, the plaintiff insurance company insured a condominium association. 337 N.J. Super. at 69. In January 1994, a snow and ice storm caused damage to the condominiums. *Id.* at 69–70. The association hired an independent contractor to fix the damage; the plaintiff paid the claim in 1994 and received subrogation rights. *Id.* at 70–71. The plaintiff, however, failed to advise the defendant developer of the payment to the contractor or of its subrogation rights. *Id.* at 71. In the meantime, the defendant reviewed the damage and determined that the contractor had not fixed the problem. *Id.* at 70. As a result, the defendant undertook the necessary repairs at substantial cost. *Id.* In 1996, the defendant settled related litigation with the association's new insurance company but did not provide notice to the plaintiff, the earlier insurance company. *Id.* at 71. After obtaining a general release for the related litigation, the defendant also obtained a second release in 1998 pursuant to a condominium transition agreement. *Id.* In 1998, the plaintiff sued the defendant pursuant to its right to subrogation. The trial court ruled that the defendant's

---

[20] Citizens further notes that Janed's settlement was paid by its liability insurer. Citizens contends that such policies generally cover property damage, which would also support Citizens' claim that Janed actually paid for the same claims that National asks Citizens to pay.

1996 and 1998 settlement and releases immunized the developer from the plaintiff's subrogation claim. *Id.*

The court in *Hovnanian* began by stating the general rule that an insured victim's release of a tortfeasor ordinarily bars a later subrogation claim by an insurance company unless the tortfeasor was on notice that the insurance company had already paid the claim. *Id.* at 72. The Appellate Division clarified that an insurance company had to first pay the claim before receiving a right to subrogation. *Id.* (citations omitted). The court stated that the policy underpinning the rule was to prevent fraud on the insurance company and to prevent double recovery for the insured victim. *Id.* (citations omitted).

The *Hovnanian* court then rejected the plaintiff's argument that the defendant had a duty to inquire and learn of the plaintiff's 1994 payment of the claim. *Id.* at 73-74. Instead, the court ruled, the burden was on the insurance company to notify the defendant of the company's subrogation rights because the insurance company had certain knowledge of its payment as well as the ability to timely notify the defendant. *Id.* at 74. (citing *Aetna Cas. & Sur. Co. v. Norwalk Foods, Inc.*, 480 N.Y.S.2d 851, 854 (Civ. Ct. 1984)). The Appellate Division continued that the defendant did not seek either release from the association in an effort to impair the plaintiff's subrogation rights. *Id.* The *Hovnanian* court reasoned that the defendant's two releases involved more substantial and different aspects of the relationship between the defendant and the association, neither release mentioned the repair work by the independent contractor, and, as a result, there was no concern of double recovery by the association. *Id.* at 74-75. The Appellate Division closed with a limitation on the scope of its decision:

> We do not intend to imply that it is only the tortfeasor's actual knowledge of payment of the claim by the insurer that can ever defeat the protection of the release. Obviously, that protection is forfeited by a tortfeasor who knows that the claim against him is

39

> covered by an insurer and who accepts a release from the insured
> with fraudulent or collusive intent or in culpable disregard of the
> insurer's protectable interest in acquiring its subrogation rights. *See,*
> *e.g., Standard Accident Ins. Co. v. Pellecchia, supra,* 15 *N.J.* at 175
> (noting that the settling tortfeasor "was aware of [the insurer's]
> interest and of its desire to be consulted in this matter....")[.]  *See*
> *also, generally,* Annotation, *Rights and Remedies of Property*
> *Insurer As Against Third-Person Tortfeasor Who Has Settled With*
> *Insured,* 92 *A.L.R.*2d 102 (1963). There is nothing in this record
> suggesting that [the defendant] was guilty of any such intentional
> interference with [the plaintiff]'s subrogation rights.

*Id.* (citation omitted).

In *Nucci,* the Appellate Division once again reviewed subrogation rights. In that case, the plaintiff purchased homeowner's insurance from the defendant insurance company. 2014 WL 6977767 at *1. The plaintiff's home allegedly suffered damages from blasting operations on her neighbor's property, but the defendant denied the plaintiff's claim for coverage. *Id.* The plaintiff sued the defendant for not honoring her claim, and she also sued the respective tortfeasors for causing the damage. *Id.* In response, the defendant insurance company filed a cross-claim against the tortfeasors for recovery via subrogation if the defendant made any future payment to the plaintiff. *Id.* The plaintiff thereafter settled her claims with some of the tortfeasors but did not inform the defendant. *Id.* The trial court granted summary judgment for the defendant, concluding that the plaintiff had forfeited her right to seek reimbursement from the defendant when she eliminated the defendant's right to seek subrogation by settling with certain tortfeasors. *Id.* at *2.

The court in *Nucci* began by noting that subrogation is "highly favored" in the law because it compels the ultimate payment of an obligation by the person who ought to pay it. *Id.* (citing *Culver v. Ins. Co. of N. Am.,* 115 N.J. 451, 455-56 (1989)). The Appellate Division explained that subrogation prevents double recovery for an insured victim while at the same time precluding the tortfeasor from escaping liability. *Id.* (citations omitted). The *Nucci* court, citing *Hovnanian,* 337

40

N.J. Super. at 72, stated that an insurance company does not have a right of subrogation against the tortfeasor until it has first paid the insured's claim but also noted that an insurance company has standing to assert its claim as subrogee even if it has not yet paid the claim pursuant to *Foley Mach. Co. v. Amland Contractors Inc.*, 209 N.J. Super. 70, 77 (App. Div. 1986). *Id.* at *3.

The court then addressed the plaintiff homeowner's argument that the defendant insurance company waived its rights to subrogation when it denied the plaintiff's claim. *Id.* The court in *Nucci* discussed the plaintiff's assertion in light of the absolute waiver rule, which provides that an insurance company forfeits all rights to subrogation if it does not pay the insured's claim. The court noted that the application of the absolute waiver rule had not been decided in New Jersey. *Id.* at *5. The Appellate Division observed that the majority of jurisdictions have adopted the rule although some jurisdictions provide an exception for good faith disputes concerning coverage. *Id.* at *3-5 (citations omitted). On the other hand, the court noted, jurisdictions that have rejected the absolute waiver rule have reasoned that the rule forces insurance companies to pay a claim regardless of the merits and the rule is inconsistent with the policy that those actually responsible (the tortfeasors) should bear the ultimate financial obligation. *Id.* at *4 (citations omitted). Yet, the *Nucci* court pointed out, even in absence of the absolute waiver rule, a bad faith denial of a claim would preclude an insurance company's right to subrogation. *Id.* at *5.

The panel in *Nucci* then noted that in the majority of jurisdictions, a settling tortfeasor remains liable in subrogation to an insurance company that did not consent to the settlement *if* the tortfeasor knew of the insurance company's subrogation rights. *Id.* at *6. (citing 5 *New Appleman Insurance Law Library Edition*, §49.01[3], at 49-11 (2014)). The court stated that it had previously applied this general rule in *Hovnanian. Id.* The *Nucci* court noted that in *Hovnanian*, the insurance company had paid the claims prior to settlement but failed to assert its subrogation rights until after

41

the settlement.  *Id.* at *7.  By comparison, in the case before it, the Appellate Division observed that the defendant asserted its subrogation rights before settlement but had not yet paid the insured's claim.  *Id.*  Thus, despite the "broad language in *Hovnanian*" that an insurance company does not have subrogation rights until it actually pays the underlying claim, the *Nucci* court found that the Appellate Division had not yet addressed the factual scenario present in the case before it. *Id.*  To buttress this point, the court in *Nucci* pointed to *Hovnanian* court's clear limitation on its holding, such as when the insured and settling tortfeasor colluded against the insurance company when settling.  *Id.*

The *Nucci* court ultimately did not decide the issue before it because the parties had failed to raise the *Hovnanian* decision with the trial court.  *Id.*  More importantly, the court noted, if it were to rule, the decision would implicate the rights of persons not before it, namely the settling co-defendants.  *Id.* at *8.  The panel in *Nucci* stated that it was unwilling to impose liability on the settling co-defendants without first giving them an opportunity to be heard by the trial judge.  *Id.*

Turning to the current matter, the Court first notes that it disagrees with Citizens' position that this issue is controlled by long-standing New Jersey law.  In support of this contention, Citizens cites the *Nucci* decision.  *Nucci*, however, is an unpublished decision of the Appellate Division and is, therefore, non-precedential.  However, the Court considers *Nucci* as persuasive authority because it was authored by New Jersey's second-highest court and because the panel conducted a thorough and reasoned analysis.

In light of the limiting language in *Hovnanian* addressing an alleged tortfeasor's knowledge of an insurance company's subrogation rights and the *Nucci* court's interpretation of *Hovnanian*, this Court finds that Citizens has not forfeited its right to seek subrogation from Janed because Citizens has not yet paid the underlying claim.  The Court recognizes that the *Hovnanian*

court stated that subrogation rights do not arise until the insurer pays the claim. First, this is an accurate statement insofar as Citizens will not have right to seek subrogation unless and until it pays National's claim. In addition, New Jersey has not adopted the absolute waiver rule; indeed, National claims that it is not proceeding under the theory.

More importantly, the factual scenario in this case is very similar to that in *Nucci*: the insurer, Citizens, asserted its potential subrogation rights as to the tortfeasor, Janed, even though it had not yet paid the insured, National. The *Nucci* court concluded that this scenario was different than that of *Hovnanian* and that the scenario had not yet been addressed by the New Jersey courts. The *Nucci* panel did not deny the defendant insurance company's ability to seek subrogation because it had not yet paid the plaintiff's claim, although the Appellate Division certainly could have done so without a remand to the trial court because such a ruling would not have adversely affected the settling co-defendants. Thus, pursuant to the court's reasoning in *Nucci*, the *Hovnanian* courts commentary concerning the necessity of the insurance company's payment of the claim to sustain the company's subrogation rights is not applicable here. Indeed, the court in *Nucci* expressly noted that the majority of jurisdictions have found that if a tortfeasor knows of an insurer's subrogation rights, the tortfeasor remains liable in subrogation even if the tortfeasor settled with the insured victim when the insurance company has not consented to the settlement. Here, as a factual matter, Janed certainly was aware of Citizens' subrogation rights before it settled with National. Indeed, the purpose of Citizens' third-party complaint against Janed was subrogation. Moreover, Citizens did not consent to the settlement between National and Janed.

Relatedly, Citizens has also alleged that National and Janed colluded in their settlement in an effort to frustrate Citizens' subrogation rights. Specifically, Citizens asserts that National and Janed inappropriately categorized and allocated the amounts paid by Janed in an effort to put them

beyond the reach of subrogation.  First, *Hovnanian* expressly recognized that its holding did not apply to collusive behavior between the tortfeasor and the insured victim.  Second, such material facts also preclude any judgment pursuant to National's made whole theory of recovery.  These material fact issues existed when Judge Chesler issued his opinion, and National has failed to submit any additional evidence demonstrating that there is no longer any genuine issue of material fact.

Finally, as to National's bad faith argument, the Court has already addressed the issue earlier in the Opinion.  For the reasons stated, National's argument is denied.

For the foregoing reasons, the Court denies National's motion for summary judgment as to subrogation.

## V.  CONCLUSION

For the reasons set forth above and for good cause shown, the Court **GRANTS** Plaintiff's motion for summary judgment on the issue of coverage under the Policy.  The Court also **GRANTS** Plaintiff's motion for summary judgment on the issue of cooperation under the Policy.  The Court **DENIES** Plaintiff's motion for summary judgment on the issue of subrogation.  The Court **GRANTS** Defendant's motion for summary judgment on the issue of bad faith and **DENIES** Defendant's motion as it relates to coverage under the Policy, including Business Income and Extra Expense Coverage.[21]  An appropriate form of order accompanies this opinion.

**Date:** December 30, 2016

JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE

---

[21] As noted, National did not move for summary judgment as to the Business Income and Extra Expense Coverage.  As a result, the Court is denying Citizens' motion as to the specific coverage but is not granting summary judgment in favor of National.

44